## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**PAYCARGO FINANCE LP,**

        **Plaintiff,**

**v.**                                    **Case No. 1:22-cv-22707**

**ASPEN AMERICAN INSURANCE
COMPANY,**

        **Defendant,**

**BAY MARITIMES INC.,**

        **Nominal Defendant.**

_____/

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## AND INCORPORATED MEMORANDUM OF LAW

Defendant, ASPEN AMERICAN INSURANCE COMPANY ("Aspen"), pursuant to Federal Rule of Civil Procedure 56(a) and Local Rule 56.1, hereby files its Motion for Summary Judgment and Incorporated Memorandum of Law ("Motion"), and in support hereof states:

Plaintiff, PAYCARGO FINANCE LP ("PCF"), has filed a one-count Complaint against Aspen alleging that, pursuant to a Federal Maritime Commission ("FMC") bond ("FMC Bond"), Aspen is liable to pay a state court judgment ("State Court Judgment") PCF obtained against the Bond principal, BAY MARITIMES, INC. ("Bay Maritimes"). The Bond does not cover PCF's alleged claim in this action ("Claim"), and, therefore, summary judgment should be entered for Aspen.

## BACKGROUND FACTS

1.      PayCargo, LLC ("PayCargo"), which is not a party to this action, operates the PayCargo System which is an online platform for vendors on the PayCargo System to initiate

payments to other PayCargo System vendors.  Aspen's Statement of Undisputed Material Facts ("SUMF"), ¶ 1.

    2.      PCF, which is a separate and distinct entity from PayCargo, is a lender that provides financing to certain vendors that use the PayCargo System. SUMF, ¶ 2.

    3.      On October 28, 2020, PCF entered into a Credit Agreement with Bay Maritimes, a Canadian entity that held a license from the FMC as a Non-Vessel Operating Common Carrier ("NVOCC"). SUMF, ¶¶ 3, 5. An NVOCC is an entity that acts as a common carrier that is a shipper in its relationship with an ocean common carrier. *See* 46 U.S.C. § 40102(17).

    4.      Pursuant to the Credit Agreement, PCF agreed that in exchange for a fee, Bay Maritimes would have access to a revolving line of credit ("Line of Credit") of up to $500,000.00 in funds held by PayCargo, which Bay Maritimes could use to pay any vendor on the PayCargo System. SUMF, ¶¶ 6-7.

    5.      PayCargo, at the request of Bay Maritimes, would make payments to vendors on the PayCargo System. SUMF, ¶ 8. Thirty days after the payments, PayCargo would debit Bay Maritimes' account to reimburse PayCargo for the payments and collect additional fees payable to PCF. SUMF, ¶ 9.

    6.      PCF guaranteed that Bay Maritimes would repay PayCargo for any funds borrowed from the Line of Credit. SUMF, ¶ 10. Accordingly, if Bay Maritimes did not repay PayCargo for funds it borrowed from the Line of Credit, PCF would pay PayCargo and then could seek reimbursement from Bay Maritimes under the Credit Agreement. SUMF, ¶ 10.

    7.      PCF alleges that Bay Maritimes made several dozen payments on the PayCargo System using the Line of Credit ("Vendor Transactions") and then failed to have funds available to repay PayCargo when PayCargo debited Bay Maritimes' account. SUMF, ¶ 12. As a result,

PayCargo looked to PCF for payment, and PCF paid PayCargo. SUMF, ¶ 33. PCF then sought reimbursement from Bay Maritimes under the Credit Agreement, but Bay Maritimes did not reimburse PCF in full. SUMF, ¶ 34. PCF then brought suit against Bay Maritimes for breach of the Credit Agreement and eventually obtained the State Court Judgment in the principal amount of $142,815.79 plus accrued pre-judgment interest in the amount $7,733.25. SUMF, ¶¶ 36-38.

8.      On August 25, 2022, PCF filed its one-count Complaint [ECF No. 1] against Aspen, alleging that Aspen was liable under the Bond to compensate PCF for the State Court Judgment. SUMF, ¶ 39.

9.      The parties have completed discovery and the matter is currently scheduled for trial during the Court's November 2023 trial period. SUMF, ¶¶ 55-56.

## GROUNDS FOR THE MOTION

10.     Summary judgment should be entered in Aspen's favor because the Bond does not cover PCF's Claim, for four independent reasons: (i) Bay Maritimes did not act as an NVOCC in any transaction with PCF that gave rise to the State Court Judgment; (ii) there is no competent, admissible evidence to prove that Bay Maritimes was acting as an NVOCC in the Vendor Transactions; (iii) there is no competent, admissible evidence to prove that the State Court Judgment arises from Bay Maritimes' transportation-related activities as defined by the FMC; and, (iv) PCF cannot prove that the State Court Judgment is covered by the Bond because it cannot prove which, if any, of the alleged Vendor Transactions comprise the principal amount of the State Court Judgment.

## INCORPORATED MEMORANDUM OF LAW

### A.      Applicable Summary Judgment Standard.

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 where the

moving party demonstrates that there are no genuine issues of material fact and it is entitled to judgment as a matter of law. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986) (citations omitted). A factual dispute by itself cannot defeat a motion for summary judgment. Instead, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original). A dispute is "'genuine' if a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. US.,* 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson,* 477 U.S. at 247-48). A fact is "'material' if it would affect the outcome of the suit under the governing law . . . ." *Id.* Once the moving party has met its burden to show no genuine dispute of material fact and entitlement to judgment as a matter of law, in order "[t]o defeat a motion for summary judgment, the non-moving party must do more than simply show that there is some doubt as to the facts of the case." *Rosenthal,* 2010 WL 11505839, *4. "The mere existence of a scintilla of evidence in support of the [opposing party's] position will be insufficient." *Anderson,* 477 U.S. at 252. Thus, the party opposing a motion for summary judgment must establish the existence of a genuine issue of material fact and may not rest upon its pleadings or mere assertions of disputed facts to defeat the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

    **B.**    **The Bond does not cover PCF's Claim because Bay Maritimes did not act as an NVOCC in any transaction with PCF.**

PCF's Claim is based on the State Court Judgment that PCF obtained against Bay Maritimes. SUMF, ¶ 40. For an FMC Bond to cover a judgment that the claimant has obtained

against the bond principal, the judgment must arise from a transaction between the principal and the claimant in which the principal was acting as an NVOCC. *See AEL Asia Express (H.K.), Ltd. v. American Bankers Ins. Co.*, 5 Fed. App'x 106, 109-110 (4th Cir. 2001) ("*AEL*"). For the principal to have acted as an NVOCC in the relevant transaction, the principal must have provided an NVOCC service to the claimant. *See id.* at 109 ("[T]he bond covers the transportation-related activities of an NVOCC when acting as an NVOCC . . . . **To the extent that someone who operates as an NVOCC also provides** non-NVOCC services**, those services** would not be covered by the bond.") (citation omitted) (emphasis added).

Here, the transaction that gave rise to the State Court Judgment was Bay Maritimes' failure to repay PCF pursuant to a Credit Agreement and the only service Bay Maritimes was supposed to provide to PCF in that transaction was the repayment of the borrowed funds. SUMF ¶ 10, 40. Bay Maritimes' repayment obligation to its lender is not an NVOCC service because it does not involve the service of a common carrier that is a shipper in its relationship with an ocean common carrier. *See* 46 U.S.C. § 40102(17). Because the Bond does not cover PCF's Claim, Aspen is entitled to judgment as a matter of law.

> 1.    For an FMC Bond to cover *a judgment against the bond principal, the principal must have acted as an NVOCC in the transaction that gave rise to the judgment.*

Section 40902 of Chapter 46 of the United States Code ("Section 40902") governs FMC Bonds, which are issued to mitigate covered losses arising from the provision of NVOCC services to the claimant.[1] *See* H.R. Rep. No. 101-785 (1990) ("The FMC has reported receiving an

---

[1]    Section 40902 applies to bond claims where the principal is an ocean transportation intermediary, a term which, per 46 U.S.C. § 40102, is defined as either an NVOCC or an ocean freight forwarder. An ocean freight forwarder is defined by 46 U.S.C. § 40102(19) as a person that

increasing number of complaints concerning the activities of NVOCCs . . . . These offending NVOCC practices include: **failure to deliver cargo, failure to honor loss and damage claims, and abandonment of cargo** at ports throughout the world . . . . [M]any persons **injured by [these] NVOCC actions** are not able to recover their losses. The bonding requirement . . . should resolve most of these problems.) (emphasis added). For an FMC Bond to cover a judgment obtained by a claimant against the bond principal, the principal must have acted as an NVOCC in the transaction **with the claimant** that gave rise to the judgment. *See AEL*, 5 Fed. App'x at 107-110 (analyzing whether principal was acting as an NVOCC in the transaction with the claimant to determine whether Bond applied to judgment); *cf. Drayage Express, LLC v. Int'l First Serv. USA*, 3-15-CV-3597-FLW-LHG, 2016 WL 6828572, at *3 (D.N.J. Nov. 18, 2016) (implicitly recognizing that one of a surety's available defenses to a claim against an FMC Bond is that the principal was not acting as an NVOCC with respect to the claimant: "Specifically, this Court is making no finding whether . . . Global Wine [bond principal] was acting as an ocean freight forwarder or a non-vessel-operating common carrier **with respect to Plaintiff** [bond claimant].") (emphasis added).

In *AEL*, the Fourth Circuit was tasked with interpreting the scope coverage of an FMC Bond issued under an earlier codification of the current section 40902. *Id.* at 107.[2] In *AEL*, the

---

"in the United States, dispatches shipments from the United States via a common carrier and books or otherwise arranges space for those shipments on behalf of shippers" and "processes the documentation or performs related activities incident to those shipments." PCF has not alleged that Bay Maritimes acted as an ocean freight forwarder in any capacity related to this litigation. Even if PCF had suggested as much, however, Bay Maritimes was not acting as an ocean freight forwarder in its transaction with PCF because it was not providing any ocean freight forwarder service to PCF. Bay Maritimes would also not qualify as an ocean freight forwarder because it is located outside of the United States. SUMF, ¶ 3.

[2]     Section 40902 was previously codified as 46 U.S.C. § 1721. The holding and reasoning of *AEL* apply here because the language in section 40902 at issue in this action is substantively identical to the language of 46 U.S.C. § 1721 construed by the Fourth Circuit in *AEL*. The recodification of that provision made "no substantive change in the law" and "simply provide[d]

claimant had obtained a judgment against a principal that was licensed as an NVOCC and argued that the principal's FMC Bond covered the judgment. *Id.* The claimant further argued that it was not required to show that the principal was acting as an NVOCC in the transaction between the principal and the claimant to recover against an FMC Bond. *Id.* at 108. The Fourth Circuit disagreed and held that for the claimant to be able to recover against an FMC Bond, the principal must have been acting as an NVOCC in the transaction between the principal and claimant that gave rise to the judgment. *Id*. at 108-111 ("The bond . . . applies only when the principal acts as an NVOCC.").

The basis of the court's conclusion was twofold. *Id.* First, the court reviewed the legislative history behind section 40902 and noted that FMC Bonds were intended to apply specifically to companies in the performance of NVOCC services, not other services those companies may also provide. *Id.* at 109. Second, the court considered the FMC's interpretation of the scope of coverage of an FMC Bond. *Id.* The FMC had specifically noted, "the bond covers the transportation-related activities of an NVOCC ***when acting as an NVOCC***." *Id.* (citation omitted) (emphasis added). On that basis, the court held that "the [principal] must serve as the NVOCC in the relevant transaction for the bond to apply . . . . ***To hold otherwise would transform the bond into a general insurance policy.***" *Id.* at 110 (emphasis added).

After holding that the claimant was required to show that the principal was acting as an NVOCC in the relevant transaction, the Fourth Circuit evaluated whether the principal was in fact acting as an NVOCC in the transaction between the claimant and the bonded principal that allegedly gave rise to the judgment. 5 Fed. App'x at 110-11. To decide this question, the court reviewed the services the principal was providing to the claimant in the transaction. *Id.*

---

clarity and reorganization." *See* Completing Codification of Title 46 United States Code, "Shipping", as Positive Law, 151 Cong. Rec. H 10247, at 10312 (2005).

Specifically, the claimant had hired the principal to provide freight collection services. *Id.* at 106, 110-111. The Fourth Circuit analyzed the services the principal was providing to the claimant and concluded, despite the fact that the bonded principal was handling funds for specific freight shipments, that those services were not "NVOCC services." *Id* at 110. Instead, the court held that the principal in its relationship with the claimant was merely acting as a "collection agency" and rejected that as a basis to impose liability under the FMC Bond. *Id.* at 110-111.

In accordance with the reasoning and holding of *AEL*, the key question to determine if a principal was acting as an NVOCC in the "relevant transaction" such that a claim might be covered by an FMC Bond is whether the principal was providing an NVOCC service to the claimant in that transaction. *See id.* at 110 (analyzing whether principal was providing NVOCC services to claimant in transaction that gave rise to judgment). If the principal was providing an NVOCC service to the claimant, a claim arising from the provision of such service would potentially be covered by the FMC Bond.[3] *See id.* at 109-10 (recognizing that bond would cover provision of NVOCC services by principal to claimant). If, however, the principal was not providing an NVOCC service to the claimant, there would be no bond coverage. *See id.* at 110 (concluding that bond did not cover claim because principal was not providing NVOCC services to the claimant).

> 2.  *The relevant transaction that gave rise to the State Court Judgment was Bay Maritimes' failure to repay PCF pursuant to the Credit Agreement.*[4]

---

[3] In addition to the requirement that the principal provide NVOCC services to the claimant, a claim must also satisfy further requirements to be covered under an FMC Bond including, but not limited to, the requirement that the claim arise from the transportation-related activities of the principal as defined by federal law. 46 U.S.C. § 40902(2), (3).

[4] The undisputed material facts differ from the allegations of the Complaint in several important respects. The allegations of the Complaint suggest that PCF played a direct role in Bay Maritimes' payments to its vendors by advancing funds to the vendors and then debiting Bay Maritimes' account for repayment. *See* Complaint, ¶¶ 7, 9-10. The Complaint also does not specify that PCF and PayCargo are separate and distinct entities. *See generally*, Complaint. During the course of discovery, PCF testified that it was PayCargo, LLC, not Plaintiff, PayCargo Finance,

On October 28, 2020, PCF and Bay Maritimes entered into a Credit Agreement pursuant to which PCF agreed that Bay Maritimes would have access to the Line of Credit. SUMF, ¶¶ 5-6. Bay Maritimes could use the Line of Credit to pay any vendor on the PayCargo System. SUMF, ¶ 7. Contrary to the allegations of the Complaint that the Line of Credit could only be used to pay for specific freight shipments, Bay Maritimes was able to use the Line of Credit for any purpose so long as the entity to which Bay Martimes wanted to make payment was in the PayCargo System.[5] *See* SUMF, ¶ 7.

Once the parties executed the Credit Agreement, neither PayCargo nor PCF required any further approval for Bay Maritimes to initiate any payments on the PayCargo system. SUMF, ¶ 7. Further, PCF did not administer or oversee payments to vendors and PCF had no role whatsoever in such payments. SUMF, ¶ 8. Instead, *PayCargo*, made the payments to vendors directly through the PayCargo system and debited Bay Maritimes' bank account thirty days later, SUMF, ¶ 8-9. PCF's role was only to pursue Bay Maritimes for its liability under the Credit Agreement if PayCargo's debits did not clear, and PCF was not involved in any way with any of Bay Maritimes alleged transactions with vendors on the PayCargo system. SUMF, ¶ 10.

For a time, Bay Maritimes allegedly used the PayCargo system to make payments to vendors on the system, and PayCargo debited Bay Maritimes' bank account for repayment. SUMF, ¶ 9. Then, as initially represented by PCF, Bay Maritimes failed to have sufficient funds in its bank account for the debits to clear. SUMF, ¶ 12. Accordingly, PayCargo looked to PCF to hold it

---

LP, that had advanced funds to the vendors and debited Bay Maritimes' account. *See* SUMF, ¶¶ 8-9. PCF was not a participant in any of those payments and was nothing more than an entity guaranteeing that PayCargo would be repaid if Bay Maritimes failed to repay PayCargo. *See* SUMF, ¶¶ 8-10.

[5]     For example, in the Claim Submission that PCF presented to Aspen for payment, PCF includes payments made to Growth Capital Corp. SUMF, ¶ 14. Growth Capital Corp. is a Canadian financing company that Bay Maritimes sent money to through the PayCargo System. SUMF, ¶ 44.

harmless from loss, which PCF did. SUMF, ¶ 33. PCF then sought reimbursement from Bay Maritimes under the Credit Agreement and obtained the State Court Judgment. SUMF, ¶ 34, 38.

Given these facts, the "relevant transaction" – the transaction that gave rise to PCF's bringing suit against Bay Maritimes and obtaining the State Court Judgment – *is* Bay Maritimes' breach of its repayment obligation under the Credit Agreement for the funds PCF had paid to PayCargo, but *is not* a Vendor Transaction between Bay Maritimes and one of its vendors on the PayCargo System. Indeed, when PCF moved for entry of the State Court Judgment in the State Court Action, PCF stated, "*the Complaint is based on a failure to comply with an agreement pertaining to a line of credit* [Bay Maritimes] received from [PCF] in connection with PayCargo" and further stated that Bay Maritimes "*was in default under the Credit Agreement which entitle[d] PCF to accelerate the full balance of credit extended.*" *See* Ex. "J" to SUMF, Motion for Default Judgment, ¶ 1, and Declaration of Damages, ¶ 6 (emphasis added).

> 3. *Bay Maritimes was not acting as an NVOCC in its relationship with PCF and did not provide any NVOCC service to PCF as would be required for the Bond to cover PCF's Claim.*

An NVOCC is a common carrier that is a shipper in its relationship with an ocean common carrier. *See* 46 U.S.C. § 40102(17). "NVOCC services" are those of a (1) common carrier that is (2) shipping goods via (3) an ocean common carrier. A "common carrier" is further defined as a person that "(i) holds itself out to the general public to provide transportation *by water* of passengers or cargo *between the United States and a foreign country* for compensation; (ii) *assumes responsibility for the transportation* from the port or point of receipt to the port or point of destination; and (iii) uses, for all or part of that transportation, *a vessel operating on the high seas or the Great Lakes between a port in the United States and a port in a foreign country*." 46 U.S.C. § 40102(7) (emphasis added). An "ocean common carrier" is defined as a "vessel-operating

common carrier." 46 U.S.C. § 40102(18). In essence, to be providing NVOCC services in a transaction, the NVOCC must take responsibility for transporting something over the ocean or the Great Lakes, and to or from the United States and a foreign country. *Id.* In its relationship with PCF, Bay Maritimes did none of those things.

The only service that Bay Maritimes could have rendered to PCF would have been repayment under the Credit Agreement, which is not an NVOCC service under 46 U.S.C. § 40102(17). In its relationship with PCF, Bay Maritimes was not acting as a "common carrier" or a "shipper" in relation to an ocean common carrier, was not assuming responsibility for the transport of goods, and was not using "a vessel operating on the high seas or the Great Lakes between a port in the United States and a port in a foreign country" for any transportation service to PCF. *See generally*, SUMF, ¶¶ 10, 40. In short, Bay Maritimes was not acting as an NVOCC in any transaction with PCF and never provided any NVOCC service to PCF. Accordingly, the Bond does not cover the State Court Judgment that arose from those alleged transactions between PCF and Bay Maritimes and summary judgment should be entered in Aspen's favor. To hold otherwise and allow PCF to make a claim under the Bond, which is only designed to cover the provision of NVOCC services, "would transform the bond into a general insurance policy," *AEL*, 5 Fed. App'x at 110, and go far beyond the intended and reasonable scope of an FMC Bond.

    **C.    PCF's Claim also fails because it cannot demonstrate with any competent, admissible evidence that Bay Maritimes was acting as an NVOCC in the alleged Vendor Transactions.**

Even if this Court decides that the relevant transactions under *AEL* were the alleged Vendor Transactions on the PayCargo System, PCF has no competent, admissible evidence to prove that Bay Maritimes was acting as an NVOCC in those Transactions. *See AEL*, 5 Fed. App'x at 109-110 ("[T]he [principal] must serve as the NVOCC in the relevant transaction for the bond

to apply."). Because PCF cannot prove that Bay Maritimes acted as an NVOCC in the alleged Vendor Transactions, it cannot prove that its Claim should be covered by the Bond and summary judgment should be entered in Aspen's favor.

Despite the fact that PCF had no direct involvement in any of the alleged Vendor Transactions, that PCF does not know which of those alleged Vendor Transactions form the basis for the State Court Judgment, and that the only transaction between PCF and Bay Maritimes is PCF's attempt to collect debt under the Credit Agreement which is entirely separate from any of Bay Maritimes' potential services as an NVOCC, PCF submitted a claim to Aspen against the Bond on June 9, 2021, demanding that Aspen reimburse it in the amount of $156,911.75. SUMF, ¶¶ 11, 15. In its Claims Notification Form ("Claim Submission"), PCF represented to Aspen that beginning in February of 2021, Bay Maritimes made 54 payments on the PayCargo System using the Line of Credit and then failed to have funds available to repay PayCargo when PayCargo debited Bay Maritimes' account. SUMF, ¶ 13. PCF represented that its Claim against the Bond was related to the Vendor Transactions and, specifically, that those Transactions consisted of 42 payments to Hapag-Lloyd (Canada), Inc. ("Hapag Lloyd") in the total amount of $75,047.31; 2 payments to Maersk Line ("Maersk") in the total amount of $7,482.91; and 9 payments to Growth Capital Corp. ("Growth Capital") in the total amount of $90,470.00. SUMF, ¶ 14.[6]

In handling the Vendor Transactions, PayCargo received certain alleged information from

---

[6]    As will be discussed in greater detail later in this Memorandum, PCF subsequently attempted to materially alter the information in PCF's Claim and represented, among other things, that the Vendor Transactions in question actually involved five entities: the three listed above, plus two entities named "Global Shipping" and "Safmarine". SUMF, ¶ 46-47. Further, the sum of the original three groups of Vendor Transactions in the Claim Submission does not equal $156,911.75 as alleged by PCF, but instead equals $173,000.22, further evidence, as will also be discussed below, that PCF has failed to explain its alleged Claim accounting because it does not know and cannot prove the specific Vendor Transactions that make up the State Court Judgment.

Bay Maritimes (e.g. invoice or bill of lading numbers), and forwarded that information to PCF, along with PayCargo's accounting documentation showing the date and amount of each Transaction. SUMF, ¶ 17. That information, however, is insufficient as a matter of law to demonstrate that Bay Maritimes served as an NVOCC in any of those alleged Vendor Transactions. *See*, *supra*, 46 U.S.C. § 40102(17) (discussing the statutory requirements for NVOCC status and the provision of NVOCC services); *see also* SUMF, ¶¶ 21-22.

Not only does PCF not have authenticated and otherwise admissible documentation to demonstrate Bay Maritimes' role in any of the alleged Vendor Transactions, but PCF affirmatively testified that it:

- has no knowledge or understanding of certain documents that it produced in this action that are potentially related to shipments that involved payments on the PayCargo System, SUMF, ¶¶ 29, 30;

- does not know what Bay Maritimes' relationship was with its vendors or customers, if any, SUMF, ¶ 23;

- does not know whether the alleged Vendor Transactions involved shipments to or from the United States, SUMF, ¶ 24; and

- does not know whether some of the Transactions involved shipments by sea. SUMF, ¶ 25.

With respect to the Vendor Transactions allegedly involving Hapag-Lloyd, there is no competent, admissible evidence[7] to show what Bay Maritimes' role was in the Transactions, what

---

[7]   There are some documents in the record that purport to be bills of lading and invoices issued by Hapag-Lloyd that may pertain to the Hapag-Lloyd Vendor Transactions. SUMF, ¶ 29. However, PCF has no knowledge of what these documents are or what they show. SUMF, ¶ 30. When Aspen attempted to question PCF regarding these documents, PCF expressly and repeatedly disavowed all knowledge of these documents and refused to comment on them in any way. SUMF, ¶ 30. Accordingly, as PCF has not presented any evidence and/or testimony to (i) authenticate these documents: (ii) show that these documents are admissible evidence; (iii) explain the meaning of these documents; and, (iv) explain how, if at all, these documents show that Bay Maritimes was acting as an NVOCC in the Hapag-Lloyd transactions, these documents are not competent,

Bay Maritimes' relationship was with its vendors or customers in the Transactions, or whether the Transactions involved shipments to or from the United States. *See* SUMF, ¶ 31. With respect to the Maersk Vendor Transactions, no evidence whatsoever has been provided that shows what Bay Maritimes' role was in the Transactions, what Bay Maritimes' relationship was with its vendors or customers in the Transactions, or whether the Transactions involved shipments to or from the United States. *See* SUMF, ¶ 32. And, with respect to the Global Shipping and Safmarine Vendor Transactions, no evidence whatsoever has been provided that shows what Bay Maritimes' role was in the Transactions, what Bay Maritimes' relationship was with its vendors or customers in the Transactions, whether the Transactions involved shipments to or from the United States, and, specifically as to Global Shipping, whether the Transactions involved shipments by sea, land, or air. *See* SUMF, ¶¶ 51-52. In fact, the only competent, admissible evidence in the record as to Bay Maritimes' role in any Vendor Transactions involves Growth Capital, and confirms that those transactions cannot be covered by the Bond. *See* SUMF, ¶ 44 (Bay Maritimes testifying that in the transactions with Growth Capital it was reimbursing Growth Capital, its Canadian financing company, for monies Bay Maritimes had borrowed from Growth Capital to finance transactions *in Canada* involving mostly *air and ground* transportation).

Based on the record in this action, PCF cannot prove, as is required to show that an entity was acting as an NVOCC: (i) that Bay Maritimes was acting as a common carrier in the Vendor Transactions; (ii) that Bay Maritimes was a shipper in the Vendor Transactions; or, particularly in the case of the Growth Capital and Global Shipping, (iii) that an ocean common carrier was involved in the transactions. *See* 46 U.S.C. § 40102(17) (listing elements of definition of an NVOCC); *AEL*, 5 Fed. App'x at 109-110 (discussing the statutory requirements for an entity to

---

admissible evidence to show that Bay Maritimes was acting as an NVOCC in the Hapag-Lloyd Vendor Transactions.

be operating as an NVOCC and providing NVOCC services). Because PCF cannot prove that Bay Maritimes acted as an NVOCC and provided NVOCC Services in any of the alleged Vendor Transactions, PCF's Claim fails as a matter of law and summary judgment should be entered in favor of Aspen.

> **D.**     **PCF's Claim also fails because it cannot prove that the State Court Judgment arose from Bay Maritimes' transportation-related activities.**

Even if this Court decides that PCF does not need to prove that Bay Maritimes was acting as an NVOCC in the "relevant transaction" for the Bond to provide coverage or decides that PCF has met that burden, PCF cannot present any competent, admissible evidence to prove that the State Court Judgment arises from Bay Maritimes' transportation-related activities as defined by the FMC. Therefore, PCF is unable to prove that its Claim is covered by the FMC Bond and summary judgment should be entered in Aspen's favor.

Section 40902 provides that for an FMC Bond to cover a judgment, the judgment must arise from an NVOCC's "transportation-related activities" as defined by the FMC. *See id.* ("[A] judgment for monetary damages may not be enforced except to the extent that the damages claimed arise from the transportation-related activities of the [NVOCC], as defined by the [FMC]."). The FMC has recognized that for an activity to qualify as "transportation-related" under section 40902, the activity must, at a minimum, involve an ocean shipment between the United States and a foreign country and be "necessary or customary in the provision of transportation services to a customer." *See* 46 C.F.R. § 515.2(v) (providing that a "transportation-related activity" must be "involved in the foreign commerce of the United States" and "necessary or customary in the provision of transportation services to a customer"); 46 C.F.R. § 515.23(a) (providing that FMC Bond applies to "***ocean*** transportation-related activities" of an NVOCC) (emphasis added).

Here, PCF cannot prove that the State Court Judgment arises from Bay Maritimes' transportation-related activities for two reasons. First, the State Court Judgment arises from Bay Maritimes' failure to repay PCF pursuant to the Credit Agreement, i.e., a borrower's obligation to repay a lender, which is not a "transportation-related" activity. *Cf.* 46 C.F.R. § 515.2(v). Second, even if the Court finds that the State Court Judgment arises instead from Bay Maritimes' Vendor Transactions, there is no competent, admissible evidence to prove that those Transactions were "transportation-related" as defined by the FMC. PCF does not know whether the Vendor Transactions involved *ocean shipments to or from the United States*, or what Bay Maritimes' relationship was with its vendors or customers, if any, in the Vendor Transactions, and there is no record evidence that answers these questions. SUMF, ¶¶ 21-32, 51-52. Accordingly, because PCF cannot prove that the State Court Judgment arose from Bay Maritimes' transportation-related activities, PCF's Claim fails as a matter of law and summary judgment should be entered for Aspen.

> **E.     PCF's Claim fails as a matter of law because it cannot prove the alleged Vendor Transactions that comprise its State Court Judgment.**

To prove its alleged claim, it is not enough for PCF simply to obtain a judgment against Bay Maritimes and then present that judgment to Aspen for payment. 46 U.S.C. § 40902. Instead, PCF must demonstrate, among other things, the extent to which the Judgment arises from the transportation-related activities of Bay Maritimes. *See id.* To do so, PCF must, at a minimum, be able to explain the contents of the State Court Judgment and how the State Court Judgment amount was calculated. PCF cannot meet that burden.

In its Claim, PCF represented that the $156,911.75 amount for which it demanded payment from Aspen was calculated by adding up the amount of the monies Bay Maritimes had

borrowed, $287,210.13, and then subtracting the amount of any payments Bay Maritimes had made to reimburse PCF, $130,298.38. SUMF, ¶ 15-16. PCF later confirmed this when it testified: "What we did was we added up . . . the bounces . . . and then we deducted the money that came in, and that's how we got to the total owed." SUMF, ¶ 16.

After the Claim Submission, in late June and early July of 2021, Bay Maritimes made three payments toward the outstanding Claim amount totaling $20,000.00. SUMF, ¶ 35. It is not clear how those payments were credited against PCF's alleged claim, but on November 17, 2021, after PCF had commenced the State Court Action against Bay Maritimes to recover under the Credit Agreement, PCF moved for default judgment against Bay Maritimes. SUMF, ¶ 37. PCF asked the trial court to enter a default judgment in the principal amount of $142,815.79. SUMF, ¶ 37. On January 11, 2022, the court in the State Court Action entered the State Court Judgment in the total amount of $150,548.54, consisting of $142,815.79 in principal and $7,733.25 in pre-judgment interest. SUMF, ¶ 38.

On November 27, 2022, in its Initial Disclosures in this matter, PCF stated, "Growth Capital Corp., Hapag-Lloyd (Canada) Inc and Maersk Line received *the funds at issue* in this case and generated the bills of lading which correspond to each of those payments." SUMF, ¶ 41 (emphasis added); *see also* Ex. "L" to SUMF. On March 6, 2023, in its sworn answers to Aspen's Interrogatories, PCF stated, "[t]he payments here were made *to Hapag Lloyd, Inc.[,] Maersk Line, [and] Growth Capital Corp*." SUMF, ¶ 42 (emphasis added); *see also* Ex. "M" to SUMF. Further, on June 8, 2023, Aspen took its first corporate representative deposition of PCF, and PCF's representative testified that the June 9, 2021 Claim Submission accurately reflected the Vendor Transactions that PCF alleged were part of PCF's Claim. SUMF, ¶ 43.

On June 30, 2023, Aspen took the deposition of Bay Maritimes' corporate representative,

who testified, among other things, that in the Growth Capital Vendor Transactions, Bay Maritimes was reimbursing Growth Capital, its Canadian financing company, for monies Bay Maritimes had borrowed from Growth Capital to finance transactions in Canada involving mostly air and ground transportation. SUMF, ¶ 44.

Only after the deposition of Bay Maritimes, for which PCF was present, and despite at least four prior representations that Bay Maritimes' Vendor Transactions involved only Growth Capital, Hapag-Lloyd, and Maersk, PCF then took the position that Bay Maritimes' Vendor Transactions actually involved *five* entities: Growth Capital, Hapag-Lloyd, Maersk, and two never previously disclosed, Global Shipping and Safmarine. SUMF, ¶ 46-47. PCF also materially changed its allegations from what had been presented in the Claim Submission and later on in testimony, claiming that it was "a simple oversight." SUMF, ¶ 46-49.[8] Finally, PCF asserted that although it had misidentified both the amount of the Growth Capital Vendor Transactions and the entities involved in PCF's Claim, the amount of PCF's Claim as stated in the June 9, 2021 Claim Submission, $156,911.75, was still correct because it represented the *amount of the monies Bay Maritimes had borrowed minus the amount of the payments Bay Maritimes had made to reimburse PCF*. SUMF, ¶ 49; *see also* SUMF, ¶ 16.

Under section 40902, PCF must prove the contents of State Court Judgment and prove the extent that the State Court Judgment actually arises from Bay Maritimes' transportation-related activities. PCF cannot do that and its after-the-fact changes to its Claim support do nothing to cure that failure of proof. PCF has never and cannot prove the contents of the State Court

---

[8]     For reference, PCF took the position that its original Claim Submission had erroneously stated that approximately $90,000.00 in payments to Growth Capital were related to PCF's Claim, when in actuality, only about $16,000.00 in payments to Growth Capital were related to PCF's Claim and that the balance of the alleged Claim was distributed to the other alleged vendors and fees PCF had allegedly incurred. SUMF, ¶ 48.

Judgment or how the principal State Court Judgment amount of $142,815.79 was calculated.

Although PCF has alleged that the State Court Judgment consists of unpaid monies related to the

Vendor Transactions on the Pay Cargo System, which may be sufficient to support a judgment

on the Credit Agreement, PCF has no evidence to show which specific Vendor Transactions, if

any, allegedly make up the State Court Judgment, or how those transactions add up to the State

Court Judgment amount as would be required for PCF to prove its claim is covered by the Bond.

SUMF, ¶ 53-54.[9]

In sum, PCF has provided no evidence to explain what, specifically, is in the State Court

Judgment, let alone whether the State Court Judgment arises from Bay Maritimes'

"transportation-related activities." Therefore, PCF's Claim is not covered by the Bond, and

summary judgment should be entered in Aspen's favor.

WHEREFORE, for the foregoing reasons, Defendant respectfully requests that the

Court: (a) grant the instant Motion; (b) enter final summary judgment in favor of Defendant,

ASPEN AMERICAN INSURANCE COMPANY, and against Plaintiff, PAYCARGO

FINANCE, LP; and, (c) award any such further relief as the Court deems just and proper.

Dated:  August 23, 2023.

Respectfully submitted,

**GURLEY ◇ FANT**

/s/  *David E. Gurley*
David E. Gurley
(Fla. Bar No.: 0402214)
dgurley@gurleyfant.com
Michael A. Fant
(Fla. Bar No.: 0100713)

---

[9]    Further, PCF has not explained how the $20,000.00 paid by Bay Maritimes to PCF *after* the June 9, 2021 Claim was factored into the calculation of the State Court Judgment amount. *See* SUMF, ¶ 35.

mfant@gurleyfant.com
Christopher C. Fiore
(Fla. Bar No.: 1015669)
cfiore@gurleyfant.com
601 South Osprey Avenue
Sarasota, FL  34236
Telephone: (941) 365-4501
Facsimile: (941) 365-2916
eservice@gurleyfant.com
*Attorneys for Defendant*
*Aspen American Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 23, 2023, a copy of the foregoing was electronically filed with the Clerk of the Court via the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ *David E. Gurley*