UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PAYCARGO FINANCE LP,

      Plaintiff,

v.

ASPEN AMERICAN INSURANCE
COMPANY,

      Defendant,

and

BAY MARITIMES INC.,

      Nominal Defendant.

_____/

### REPORT AND RECOMMENDATION ON
### CROSS MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on cross motions for summary judgment filed by the plaintiff, PayCargo Finance LP ("PCF"), and by defendant Aspen American Insurance Company ("Aspen"). *See* ECF Nos. 45, 47.

In this action, PCF seeks damages against Aspen for breach of contract for Aspen's nonpayment of a claim that PCF made against a maritime surety bond that Aspen had issued to Bay Maritimes, Inc. ECF No. 1. PCF now seeks summary judgment on that breach of contract claim, arguing that Aspen was obligated under the terms of that surety bond to reimburse PCF for freight payments that PCF made on Bay Maritimes' behalf but for which Bay Maritimes failed to repay PCF. Aspen, in turn, seeks summary judgment against PCF on that same breach of contract claim, arguing that PCF's claims are not covered by the bond that Aspen issued to Bay Maritimes.

For the reasons set forth below, the undersigned recommends that PCF's motion for summary judgment be **GRANTED IN PART** and that Aspen's motion for summary judgment be **DENIED**.

## I.  SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Luke v. Gulley*, 50 F.4th 90, 95 (11th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)).  The Court must view the record and all factual inferences in the light most favorable to the non-moving party and decide whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir. 1997) *(*quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52 (1986)); *see also, e.g.*, *Luke*, 50 F.4th at 95.  The existence of a factual dispute by itself is not enough to defeat a motion for summary judgment; rather, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48.  "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case.  An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (quoting *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004)); *see also Mann v. Taser Int'l, Inc*., 588 F.3d 1291, 1303 (11th Cir. 2009) ("For factual issues to be considered genuine, they must have a real basis in the record.") (quoting *Hairston v. Gainesville Sun Pub. Co*., 9 F.3d 913, 919 (11th Cir. 1993)).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).  Once the moving party satisfies this burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*.,

475 U.S. 574, 587 (1986); it must provide "significant, probative evidence demonstrating the existence of a triable issue of fact," *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (quoting *Chanel, Inc. v. Italian Activewear, Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991)).  The mere existence of a "scintilla" of evidence is not enough; there must be sufficient evidence to show that a reasonable jury could return a verdict for the non-moving party.  *See Anderson*, 477 U.S. at 252; *see also Shiver*, 549 F.3d at 1343 ("Speculation does not create a *genuine* issue of fact.") (quoting *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005)).

## II.  FACTS

On June 22, 2020, Aspen issued a $150,000 NVOCC surety bond that named Bay Maritimes as the principal.  ECF No. 46-3; ECF No. 46 at ¶ 2; ECF No. 52 at ¶ 2; ECF No. 48 at ¶ 4; *see also* ECF No. 48-6 at 9.  Bay Maritimes held a license from the Federal Maritime Commission as a Non-Vessel Operating Common Carrier ("NVOCC"), ECF No. 48 at ¶ 3, and in the NVOCC surety agreement, Bay Maritimes and Aspen agreed that Bay Maritimes operated as an Ocean Transportation Intermediary (OTI) in the waterborne foreign commerce of the United States, ECF No. 46-3.[1]  In the NVOCC bond, Aspen obligated itself to "pay any judgment or any settlement made pursuant to a claim under 46 CFR § 515.23 for damages against [Bay Maritimes] arising from [Bay Maritimes'] transportation-related activities" up to the $150,000 penalty amount of the bond.  ECF No. 46-3.  The bond, moreover, explicitly provides that it "shall inure to the benefit of any and all persons who have obtained a judgment or a settlement made pursuant to a claim under 46 CFR § 515.23 for damages against [Bay Maritimes] arising from its transportation-

---

[1] "The term 'ocean transportation intermediary' means an ocean freight forwarder or a non-vessel-operating common carrier."  46 U.S.C. § 40102(20).

related activities."  ECF No. 46-3.

Bay Maritimes' business consisted of arranging and booking freight shipments that were primarily ("98 to 99 percent") "either from Canada or [the] United States to multiple destinations in the world," with its "core business . . . out of [the] United States."  ECF No. 46-7 at 17.[2]  The business that Bay Maritimes conducted in the United States was as an NVOCC and required an NVOCC bond for Bay Maritimes to ship ocean cargo from the United States to other places in the world.  *Id.* at 17-18; *see also* ECF No. 48-1 at 12-13.  As an NVOCC, Bay Maritimes was an intermediary that arranged and booked freight shipments for clients with carriers that would then transport the client's goods.  ECF No. 46-7 at 16-18; ECF No. 48-1 at 12-14.  When its NVOCC bond was cancelled, Bay Maritimes was no longer able to operate in the United States and lost all of its business from the United States.  ECF No. 46-7 at 18.

PCF provided Bay Maritimes with short-term financing for its freight shipments by paying Bay Maritimes' freight vendors up front, and then, 30 days later, Bay Maritimes' bank account would be debited for the funds that had been advanced for a particular transaction, as well as for the related fees.[3]  ECF No. 48-1 at 15, 18, 38-39, 43; ECF No. 48-5 at 199-200; *see also* ECF No. 48-1 at 26.  PCF would pay Bay Maritimes' vendors directly by advancing funds to them through the PayCargo system in connection with specific freight shipments.[4]  ECF No. 48-1 at 16-17, 60-61; ECF No. 48-5 at 220-21; *see also* ECF No. 48-1 at 53.  The money that PCF advanced to Bay

---

[2] Bay Maritimes also arranged some shipments between foreign ports that were not in Canada or the United States.  ECF No. 48-6 at 13, 17.

[3] PCF extended these services predominantly to NVOCCs.  ECF No. 46 at ¶ 9; ECF No. 52 at ¶ 9.  As part of the business of arranging shipments, an NVOCC would pay a common carrier for the freight for its client, and the client would then typically pay the NVOCC in 30 to 90 days.  ECF No. 48-1 at 13-15, 30-31.

[4] PCF only paid vendors in the PayCargo vendor network, ECF No. 48-1 at 16, 27-28, a network of vendors that are logistics and transportation-related companies, ECF No. 48-1 at 26, 28, 59.

Maritimes was not financing for general purposes, but was to be used to pay for freight transactions. ECF No. 48-1 at 25. By advancing funds, PCF facilitated Bay Maritimes' freight transactions and allowed the goods that Bay Maritimes was transporting to be moved and released quickly. ECF No. 48-1 at 30, 32-33, 43-44, 53.

Bay Maritimes used the PayCargo system to pay freight bills from vendors (such as Hapag-Lloyd (Canada) Inc. ("Hapag-Lloyd") and Maersk Line) with funds advanced on credit by PCF. ECF No. 48-1 at 15-16, 28-29. PCF's claims in this case arise from PCF paying three vendors—Hapag-Lloyd, Maersk Line, and Growth Capital Corp.—on behalf of Bay Maritimes.[5] ECF No. 48-5 at 114, 116-17. As pertinent to this case, during February and March of 2021, Bay Maritimes used PCF's financing to make more than four dozen payments through the PayCargo system to Hapag-Lloyd, Maersk Line, and Growth Capital Corp. ECF No. 46 at ¶ 18; ECF No. 52 at ¶ 18; ECF No. 46-9. Bay Maritimes, however, did not repay PCF for those transactions. ECF No. 46 at ¶ 18; ECF No. 52 at ¶ 18; *see also* ECF No. 48-1 at 29-30, 32; ECF No. 48-5 at 145-46, 221-22.

The payments to Hapag-Lloyd involved freight payments on behalf of Bay Maritimes for both shipments between the United States and foreign ports and shipments between two foreign ports. *See* ECF No. 46-10; ECF No. 46-9; ECF No. 48-7.[6] However, with respect to the payments

---

[5] Hapag-Lloyd and Maersk are both common carriers. ECF No. 46 at ¶ 21; ECF No. 52 at ¶ 21. Growth Capital is a factoring company involved in transportation and logistics, but it is not a shipper or a common carrier. ECF No. 48-6 at 19-20, 28; ECF No. 48-1 at 57-58.

[6] Aspen has objected to consideration of the Hapag-Lloyd records found at ECF No. 46-10 on the grounds that they have not been authenticated and constitute inadmissible hearsay. *See, e.g.*, ECF No. 51 at 12; ECF No. 47 at 13. Federal Rule of Civil Procedure 56, however, permits courts to consider hearsay evidence at the summary judgment stage if the evidence could be presented in admissible form at trial. *See, e.g.*, *Saunders v. Emory Healthcare, Inc.*, 360 F. App'x 110, 112 (11th Cir. 2010) ("[A] district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form.") (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999)). Indeed, Rule 56 specifically allows a party to seek summary judgment on the basis of out-of-court hearsay

made to Growth Capital and to Maersk Line, as well as with respect to several payments made to Hapag-Lloyd, the summary judgment record and the undisputed facts fail to establish the purpose of those payments.  *See* ECF No. 46-10; ECF No. 46-9; *see also* ECF No. 48-6 at 20-21, 29; ECF No. 48-5 at 122-23, 193-94, 225.

On January 11, 2022, PCF obtained a state court default judgment against Bay Maritimes in the amount of $150,548.54.  ECF No. 46 at ¶ 24; ECF No. 52 at ¶ 24; ECF No. 46-13.  The judgment included the amount of the transactions that Bay Maritimes had failed to repay PCF plus interest.  ECF No. 46-5 at ¶¶ 15-18; ECF No. 46 at ¶¶ 22-24; ECF No. 52 at ¶¶ 22-24; ECF No. 48-1 at 33.  Bay Maritimes has acknowledged that it owed the money.  ECF No. 46 at ¶ 26; ECF No. 52 at ¶ 26; *see also* ECF No. 48-6 at 29-31.

PCF thereafter made a claim on the Bay Maritimes NVOCC surety bond, ECF No. 48 at ¶ 11; ECF No. 54 at ¶ 11, and Aspen denied PCF's claim, ECF No. 46 at ¶ 28; ECF No. 52 at ¶ 28; ECF No. 46-14.

---

statements.  Fed. R. Civ. P. 56(c)(1)(A) (specifically listing, among other documents and materials that may support summary judgment, "affidavits or declarations").  Moreover, "evidence does not have to be authenticated or otherwise presented in an admissible form to be considered at the summary judgment stage, as long as the evidence could ultimately be presented in an admissible form."  *Smith v. Marcus & Millichap, Inc.*, 991 F.3d 1145, 1156 n.2 (11th Cir. 2021) (quotation omitted); *see also, e.g.*, *Maximiliano v. Simms Assocs. Inc.*, No. 17-cv-80341-BLOOM/Valle, 2018 WL 783104, at *1 n.2 (S.D. Fla. Feb. 8, 2018) (concluding that "authentication is no longer a requirement at the summary judgment stage"); *Cosmo v Carnival Corp.*, 272 F. Supp. 3d 1336, 1342 (S.D. Fla. 2017); *Saunders v. Benjamin Moore & Co.*, No. 4:11-CV-0397-JEO, 2015 WL 1489855, at *38 (N.D. Ala. Mar. 31, 2015).  "[E]vidence that can be reduced to an admissible form at trial should be considered at summary judgment."  *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1304 (11th Cir. 2022).  Here, the summary judgment record establishes that the Hapag-Lloyd records would be admissible at trial as business records pursuant to Fed. R. Evid. 803(6) and 902(11).  *See* ECF No. 54-6 (declaration of Hapag-Lloyd records custodian); *see also* ECF No. 48-5 at 214, 231-32.  Accordingly, those records will be considered.

## III.  ANALYSIS

This case and the parties' summary judgment motions revolve around the question of whether Aspen breached a contractual obligation to PCF under a marine surety bond.  "The elements of a breach of contract claim under federal common law are: '(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach.'"  *Hernandez-Rodriguez v. A1 Sun Prot., Inc.*, No. 09-23057-CIV-ALTONAGA, 2010 WL 996529, at *2 (S.D. Fla. Mar. 17, 2010) (quoting *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989)).

### A.     There Is a Valid Contract: the NVOCC Surety Bond

As an initial matter, there is no dispute in this case concerning the existence of a valid contract.  On June 22, 2020, Aspen issued a $150,000 NVOCC bond in which Bay Maritimes was the principal, and that bond remained in effect until at least on or about July 22, 2021.  ECF No. 46-3; ECF No. 46 at ¶ 2; ECF No. 52 at ¶ 2; ECF No. 48 at ¶ 4; *see also* ECF No. 48-6 at 9.

### B.     Aspen Was Obligated to PCF Under the NVOCC Surety Bond

Here, PCF seeks to recover from Aspen under the NVOCC surety bond for the damages that underlie its state court judgment, arguing that Aspen is liable on the bond because those damages arose from Bay Maritimes' transportation-related activities.  Aspen, however, contends that it is not obligated to PCF under the surety bond because Bay Maritimes did not act as an NVOCC in any transaction with PCF; because Bay Maritimes did not act as an NVOCC in its underlying transactions with its vendors; and because the state court judgment does not involve damages that PCF sustained for transportation-related activities covered by the surety bond.  *See* ECF No. 47 at 3-19; ECF No. 51 at 4-17.  As explained below, Aspen's arguments are unavailing.

In the NVOCC bond that is at issue in this case, Aspen obligated itself to "pay any judgment

or any settlement made pursuant to a claim under 46 CFR § 515.23 for damages against [Bay Maritimes] arising from [Bay Maritimes'] transportation-related activities" up to the $150,000 penalty amount of the bond.  ECF No. 46-3.  The bond, moreover, explicitly provides that it "shall inure to the benefit of any and all persons who have obtained a judgment or a settlement made pursuant to a claim under 46 CFR § 515.23 for damages against [Bay Maritimes] arising from its transportation-related activities."  ECF No. 46-3.

Additionally, it is undisputed that PCF has obtained a state court default judgment against Bay Maritimes in the amount of $150,548.54.  ECF No. 46 at ¶ 24; ECF No. 52 at ¶ 24; ECF No. 46-13.  The uncontroverted facts further establish that the state court judgment was based on damages that PCF sustained when, on more than four dozen occasions during February and March of 2021, it advanced funds through the PayCargo system to Hapag-Lloyd, Maersk Line, and Growth Capital Corp for payments on Bay Maritimes' behalf.  ECF No. 46-5 at ¶¶ 15-18; ECF No. 46 at ¶¶ 22-24; ECF No. 52 at ¶¶ 22-24; ECF No. 48-1 at 33.

 To determine whether Aspen is obligated to PCF under the NVOCC surety bond, the question that must be resolved on summary judgment is whether PCF's state court judgment encompasses claims "under 46 CFR § 515.23 for damages [against Bay Maritimes] arising from [Bay Maritimes'] transportation related activities."  ECF No. 46-3.  This requires an examination of the statutory and regulatory scheme that governs NVOCC bonds.

**1.** **_Statutory and Regulatory Scheme Governing NVOCC Bonds_**

Under federal law, a "non-vessel-operating common carrier" (NVOCC) is "a common carrier that -- (A) does not operate the vessels by which the ocean transportation is provided; and (B) is a shipper in its relationship with an ocean common carrier."  46 U.S.C. § 40102(17).  Federal law imposes a variety of obligations on an NVOCC, including the requirement that an NVOCC

"furnish[] a bond, proof of insurance, or other surety" that meets certain statutory and regulatory criteria, including that they be "in a form and amount determined by the Federal Maritime Commission to insure financial responsibility."  46 U.S.C. § 40902(a).  Such bonds "may be available to pay any claim against an ocean transportation intermediary [which includes, by definition, an NVOCC, *see* 46 U.S.C. § 40102(20)] arising from its transportation-related activities" and "shall be available to pay any judgment for damages against an ocean transportation intermediary arising from its transportation-related activities."  46 U.S.C. § 40902(b)(2), (3).  In addition, federal law charges the Federal Maritime Commission with prescribing regulations that, among other things, "shall provide that a judgment for monetary damages may not be enforced except to the extent that the damages claimed arise from the transportation-related activities of the insured ocean transportation intermediary, as defined by the Commission."  *Id.* § 40902(c).

The regulations promulgated by the FMC provide that "[s]hippers, common carriers, and other affected persons may seek payment from the bond, insurance, or other surety maintained by an ocean transportation intermediary *for damages arising out of its ocean transportation-related activities*."  46 C.F.R. § 515.23(a) (emphasis added).  The regulations further provide that the "[t]ransportation-related activities which are covered by the financial responsibility obtained pursuant to this part [such as an NVOCC bond] include, *to the extent involved in the foreign commerce of the United States*, any activity performed by an ocean transportation intermediary that is necessary or customary in the provision of transportation services to a customer, but are not limited to . . . the non-vessel-operating common carrier services enumerated in § 515.2(k)."  46 C.F.R. § 515.2(v)(2) (emphasis added).  Section 515.2(k), in turn, provides:

> Non-vessel-operating common carrier services refers to the provision of transportation by water of cargo between the United States and a foreign country for compensation without operating the vessels by which the transportation is provided, and may include, but are not limited to, the following:

(1)   Purchasing transportation services from a common carrier and offering such services for resale to other persons;

(2)   Payment of port-to-port or multimodal transportation charges;

(3)   Entering into affreightment agreements with underlying shippers;

(4)   Issuing bills of lading or other shipping documents;

(5)   Assisting with clearing shipments in accordance with U.S. government regulations;

(6)   Arranging for inland transportation and paying for inland freight charges on through transportation movements;

(7)   Paying lawful compensation to ocean freight forwarders;

(8)   Coordinating the movement of shipments between origin or destination and vessel;

(9)   Leasing containers;

(10)  Entering into arrangements with origin or destination agents;

(11)  Collecting freight monies from shippers and paying common carriers as a shipper on NVOCC's own behalf.

46 C.F.R. § 515.2(k).

### 2. *PCF's Judgment Involves Claims Arising From Bay Maritimes' Transportation Activities*

Notwithstanding the terms of the bond and the governing statutory and regulatory scheme, Aspen argues, as it previously argued in its motion to dismiss, that the payments to Bay Maritimes' vendors for the transactions underlying PCF's claims fall outside the scope of the NVOCC bond because Bay Maritimes was not acting as an NVOCC in its transactions with PCF. *See, e.g.*, ECF No. 47 at 4-11; ECF No. 51 at 5-10. Aspen again relies on *AEL Asia Express (H.K.) Ltd. v. Am. Bankers Ins. Co. of Fla.*, 5 F. App'x 106 (4th Cir. 2001), to argue that the NVOCC bond only provides coverage for transactions if Bay Maritimes, the principal on the bond, furnished transportation-related services as an NVOCC to PCF, the claimant on the bond, in its transaction

with PCF.  Aspen further argues that "the only service Bay Maritimes was supposed to provide to PCF in [its transactions with PCF] was the repayment of borrowed funds" and that "Bay Maritimes' repayment obligation to its lender is not an NVOCC service."  *See* ECF No. 47 at 5; *see also* ECF No. 51 at 10.  Aspen accordingly contends that PCF's claims do not fall within the scope of the bond's coverage.

The *AEL* decision, however, does not support Aspen's argument concerning the particular transaction that must be examined to determine whether an NVOCC bond applies.  As the Court previously explained when addressing Aspen's motion to dismiss, while *AEL* does "conclude that the [principal on the NVOCC bond] must serve as the NVOCC in the relevant transaction for the bond to apply," 5 F. App'x as 110, *AEL* does not examine that relevant transaction in the manner argued by Aspen.  On the contrary, *AEL* determined that the relevant transaction in which a bond's principal must be acting as an NVOCC is *the shipment, i.e.,* the transportation, from which the claims against the bond arise.  *AEL*, 5 F. App'x at 110 ("[W]e must decide whether the [the bond principal] was serving as an NVOCC for the shipment of pottery.").  In *AEL*, moreover, the NVOCC in the shipment at issue was not the principal on the bond, but was instead the claimant.  The principal on the bond, on the other hand, had a role that "was limited to collection and distribution of funds," and the *AEL* Court determined it "could not have served as the NVOCC" in the shipment from which the claim on the bond arose.  *Id.*

Here, the uncontroverted facts are markedly different from those that led the *AEL* Court to conclude that the NVOCC bond did not apply in that case because the bond's principal was not the NVOCC in the relevant shipping transaction.  Here, the summary judgment record establishes that, on more than two dozen occasions in February and March of 2021, Bay Maritimes was engaged in shipping freight as an NVOCC using Hapag-Lloyd as the common carrier for

shipments from the United States to foreign ports, and that PCF facilitated those transportation-related activities of Bay Maritimes by advancing funds through the PayCargo system to pay Hapag-Lloyd for those specific freight shipments. *See, e.g.*, ECF No. 46-10 at 19; ECF No. 46-9 at 61; ECF No. 46-10 at 160-62; ECF No. 46-9 at 46; ECF No. 46-10 at 157-59; ECF No. 46-9 at 44; ECF No. 46-10 at 96-97; ECF No. 46-9 at 35; ECF No. 46-10 at 163-64; ECF No. 46-9 at 31; ECF No. 46-10 at 199-200; ECF No. 46-9 at 11-12; *see also* ECF No. 46-7 at 17-18; ECF No. 48 at ¶ 3; ECF No. 46-3; ECF No. 48-1 at 15-18, 25, 60-61; ECF No. 48-5 at 220-21. Bay Maritimes' activities in which it procured Hapag-Lloyd's services for shipments from the United States to foreign ports and in which Bay Maritimes paid Hapag-Lloyd's freight charges using funds advanced by PCF for those specific shipments are "transportation-related activities" within the meaning of 46 C.F.R. § 515.2(v)(2) and Bay Maritimes' NVOCC surety bond. *See* 46 C.F.R. § 515.2(k); *see also Axess Int'l, Ltd. v. Intercargo Ins. Co.*, 183 F.3d 935, 941-42 (9th Cir. 1999) (holding that the term "transportation-related activities" must be interpreted broadly under the statute); *MacSteel Int'l USA Corp. v. M/V Ming Propitious*, No. 00 CV 279, 2003 WL 21371846, at *3 (E.D.N.Y. Apr. 2, 2003) ("[T]his court must read the phrase 'transportation-related activities' expansively to include all claims based on bills of lading for shipments between foreign ports and U.S. ports."), *vacated on other grounds*, 2003 WL 21665128 (E.D.N.Y. June 11, 2003); *P&O Containers Ltd. v. American Motorists Ins. Co.*, No. 96 Civ. 8244(JFK), 1998 WL 146229, at *3 (S.D.N.Y. Mar. 25, 1998) ("To read the term 'transportation-related activities' narrowly . . . would be at odds with the purpose of [the statute].").

Moreover, PCF's claims seeking damages for Bay Maritimes' nonpayment of the funds that PCF advanced for those Hapag-Lloyd shipments, as well as for the related fees, are claims arising from those transportation-related activities of Bay Maritimes as an NVOCC. As a result,

Aspen is obligated under the bond to pay PCF, at a minimum, for its claims based on the freight and fees for Bay Maritimes' Hapag-Lloyd ocean transportation shipments from the United States to foreign ports.  Indeed, given these facts, PCF is an intended beneficiary of the bond under the bond's terms, which provide that the bond "shall inure to the benefit of any and all persons who have obtained a judgment or a settlement made pursuant to a claim under 46 CFR § 515.23 for damages against [Bay Maritimes] arising from its transportation-related activities."  ECF No. 46-3; *see also* 46 C.F.R. § 515.23(a) (providing that "[s]hippers, common carriers, and *other affected persons* may seek payment from the bond . . . maintained by an ocean transportation intermediary for damages arising out of its ocean transportation-related activities") (emphasis added); 46 U.S.C. § 40902(b)(2), (3).

### C.    Aspen Breached Its Duty to PCF Under the Surety Bond

Because Aspen was obligated to pay at least some part of PCF's claim on the surety bond, *see supra*, and because Aspen denied the entirety of PCF's claim, Aspen has breached its contractual duties to PCF under the NVOCC surety bond.

### D.    PCF Has Suffered Damages Caused by the Breach

Here, the summary judgment record establishes that PCF suffered damages caused by Aspen's breach because PCF has not been repaid for the funds that it advanced on Bay Maritimes' behalf to pay for NVOCC ocean freight shipments from the United States to foreign ports. Accordingly, PCF has established that Aspen is liable on PCF's breach of contract claim.

At the same time, however, PCF has failed to establish the scope of the damages that are recoverable in this case on the surety bond.  Indeed, the amount of damages that PCF can recover under the bond remains unclear and unproven at this summary judgment stage.  Although PCF appears to argue that it is entitled to recover on the bond for any Bay Maritimes transactions for

13

which it advanced funds to pay Bay Maritimes' vendors and which form a part of PCF's state court judgment, *see, e.g.*, ECF No. 45 at 4, 8; ECF No. 53 at 13; *but see* ECF No. 57 at 6-7, that is not so.

The statutory scheme that establishes and requires NVOCC bonds also requires that regulations "provide that a judgment for monetary damages may not be enforced except to the extent that the damages claimed arise from the transportation-related activities of the insured ocean transportation intermediary, as defined by the Commission." 46 U.S.C. § 40902(c). The implementing regulations promulgated by the FMC, in turn, provide that "[s]hippers, common carriers, and other affected persons may seek payment from the bond . . . maintained by an ocean transportation intermediary *for damages arising out of its ocean transportation-related activities*." 46 C.F.R. § 515.23(a) (emphasis added). The regulations further provide that the "[t]ransportation-related activities which are covered by [an NVOCC bond] include, *to the extent involved in the foreign commerce of the United States*, any activity performed by an ocean transportation intermediary that is necessary or customary in the provision of transportation services to a customer, but are not limited to . . . the non-vessel-operating common carrier services enumerated in § 515.2(k)." 46 C.F.R. § 515.2(v)(2) (emphasis added). Thus, the transportation-related activities which may form the basis for a claim on an NVOCC bond are ocean transportation-related activities involved in the foreign commerce of the United States, that is, activities related to an NVOCC's ocean transportation between a foreign port and the United States.

Here, the record fails to establish whether all of the Bay Maritimes transactions from which PCF's claims arise qualify as "transportation-related activities," that is, activities related to ocean transportation between a foreign port and the United States. For example, included among the

14

payments for which PCF claims damages under the bond are payments made to Growth Capital, a factoring company.  The record is entirely unclear whether any part of the payments to Growth Capital are for qualifying "transportation-related activities."  ECF No. 48-6 at 20-21, 29; ECF No. 48-5 at 122-23, 193-94, 225; *see also* ECF No. 46-9 at 1, 9, 15, 17, 20-21, 23, 29, 50.  Similarly, it is unclear whether the Maersk Line shipments involved qualifying "transportation-related activities."  *See, e.g.*, ECF No. 46-9 at 22, 28.  Moreover, the record is clear that at least some of the shipments for which PCF advanced funds on Bay Maritimes' behalf to pay Hapag-Lloyd's freight were shipments that did not qualify as "transportation-related activities" because they involved shipments between two foreign ports and were not part of the foreign commerce of the United States.  *E.g.*, ECF No. 46-10 at 27; ECF No. 46-9 at 4; ECF No. 46-10 at 98; ECF No. 46-9 at 13-14; ECF No. 46-10 at 106-08; ECF No. 46-9 at 43.

Because the present summary judgment record fails to establish whether a variety of the Bay Maritimes transactions from which PCF's claims arise qualify as "transportation-related activities" within the meaning of the NVOCC bond, summary judgment is not warranted on the question of PCF's damages.

## IV.  CONCLUSION AND RECOMMENDATION

Based on the foregoing, I respectfully recommend that Plaintiff PayCargo Finance LP's Motion for Summary Judgment (ECF No. 45) be **GRANTED IN PART AND DENIED IN PART** and that Defendant Aspen American Insurance Company's Motion for Summary Judgment (ECF No. 47) be **DENIED**.  More specifically, I recommend that the Court grant summary judgment to Plaintiff PayCargo Finance LP on the issue of liability on its Count I claim for breach of contract, but otherwise deny summary judgment in this case.

Within fourteen (14) days from the date of receipt of this Report and Recommendation, that is, **by no later than March 11, 2024**, the parties shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Kathleen M. Williams, United States District Judge.  A failure to file timely objections will bar a *de novo* determination by the District Judge of any issue addressed in the Report and Recommendation, will constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions," and will only allow appellate review of the district court order "for plain error if necessary in the interests of justice."  11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020).

RESPECTFULLY RECOMMENDED on this 26th day of February, 2024.

_____
EDUARDO I. SANCHEZ
UNITED STATES MAGISTRATE JUDGE

cc:    Hon. Kathleen M. Williams
       Counsel of Record